Manchester Sec. v. London & Edinburgh CV-94-193-JD  08/28/96
UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF NEW HAMPSHIRE

Manchester Security Service, Inc.

       v.                                    Civil No. 94-193-JD

London & Edinburgh Ins. Co., et al.


                        O P I N I O N


     The plaintiff, Manchester Security Service, Inc.
("Manchester") brought this action under N.H. Rev. Stat. Ann.
("RSA") § 491:22, seeking, inter alia, a declaration of coverage
for loss due to theft under an insurance policy underwritten by
the defendants.  Following a hearing conducted on March 12, 13,
and 14, 1996, the court found ambiguity in the "cover note"
evidencing coverage for the 1993-1994 policy year, and permitted
the defendants to introduce extrinsic evidence of the parties'
intent not to provide coverage under the circumstances in which
the loss at issue occurred.  The court presided over a second
hearing on August 8 and 9, 1996, to consider the extrinsic
evidence proffered by the parties.

Findings of Fact

A.  The Theft

1.  The plaintiff is a New Hampshire corporation with a principal place of business at 600 Harvey Road, Manchester, New Hampshire.

2.  Prior to this lawsuit, the plaintiff primarily was engaged in the business of providing armored car services in connection with the handling and transportation of coin and currency.

3.  Each morning, Manchester's loading crew loaded coin and currency onto its fleet of armored cars before Manchester's drivers began their daily routes.  During the loading process, keys to Manchester's vehicles were distributed by the truck supervisor to members of the loading crew.  The drivers drove the vehicles from the yard behind the Harvey Road facility, where the vehicles were parked overnight, to the inside of the facility, where the vehicles were loaded, and back out to the yard, where the vehicles remained until the drivers began their daily routes.

4.  No driver or other employee of Manchester was assigned to remain on the vehicles after they were loaded and parked in the yard.

5. On the morning of October 21, 1993, a driver or drivers parked vehicle no. 24 and vehicle no. 27 of Manchester's fleet in the left rear corner of the yard with the rear doors of the vehicles facing a wooded area behind the facility.

6. Manchester's records indicate that vehicle no. 24 was loaded with $385,500 in currency, and that vehicle no. 27 was loaded with $718,000 in currency.

7. Manchester's loading crew, mechanics, and guards had access to and were periodically present in the yard while the loaded vehicles were parked there.

8. Manchester maintained a guard in a "blocker truck" parked at a gate located at the right rear of the Harvey Road facility, thereby preventing access to the yard from Harvey Road.

9. The yard behind Manchester's Harvey Road facility was not fenced in at the time and was accessible from the wooded area behind the facility. The wooded area, which is owned by the city of Manchester, is not developed. Vehicles driven from the roadways behind the Harvey Road facility can advance to a point approximately fifty feet from the edge of the wooded area.

10. At approximately 8 a.m. on October 21, 1993, Manchester employees reported that no currency bags were on board vehicle no. 24 or vehicle no. 27.

11. The sum of $1,130,500 was stolen through the back doors of vehicles 24 and 27. Each of the thefts was accomplished with the aid of at least one Manchester employee who was on board the truck at the time the money was removed.

12. Manchester timely reported a loss of $1,103,500 to the defendants.

B. The Policy in Effect

1. The defendants issued an insurance policy to Manchester covering all risks of physical loss or damage effective June 21, 1993.

2. The policy is evidenced by a cover note, which categorizes losses as "premises/vault" losses, "vehicle" losses, and "pavement" Losses, and provides in a section entitled "special conditions":

> VEHICLE: Minimum Two Armed Crew but only in respect to Shipments up to USD 2,000,000 thereafter 3 Man Crew to apply.
>
> PAVEMENT: Limit of up to USD 500,000 with one armed guard except in respect of A.T.M. replenishment/Servicing work where limit is reduced to USD 200,000.
> The limit in respect of this action is waived in respect of loading/unloading at the Bank of Boston loading Dock, or inside the Boston Federal Reserve Bank, however it is warranted that two armed guards are in attendance.

4

> Excluding all losses from unattended vehicles - this shall mean that at least one person must remain within the vehicle at all times except when vehicle is in the protected area at the Bank of Boston or inside the Boston Federal Reserve Bank.

Defendants' Ex. AA.

3. The defendants denied coverage for Manchester's loss on the ground that the loss was excluded by the unattended vehicle provision of the cover note.

C. Course of Dealing Between the Parties

1. On November 5, 1985, money was stolen from a Manchester vehicle while the vehicle was operating in Milford, New Hampshire.

2. Following the 1985 loss, Manchester's insurer at the time, Wm. H. McGee & Co., Inc., expressed its concern to Manchester that no crew member was aboard the truck at the time the money was stolen, and informed Manchester that "[i]f we are to continue with this coverage, we must insist in having the insured's confirmation of their intent to operate [with a crew member secured inside the vehicle whenever there is property on board]." Defendants' Ex. A.

3. Robert Stewart, Manchester's 2nd Vice President, acknowledged this concern in an April 14, 1986, letter to McGee:

5

> I have discussed this situation with the truck crew and made them all aware of this requirement of maintaining a crew member inside the vehicle when property is on board. This is a standard operating procedure for us and all members of my staff are in agreement as to the importance of this procedure.

Defendants' Ex. E.

4. By letter of January 2, 1987, Manchester reiterated its understanding of the "importance of operating under the required conditions," Defendants' Ex. I, and, on June 19, 1987, informed an inspector from McGee that it was abiding by those requirements.

5. On September 8, 1987, Manchester suffered another loss in Rochester, New Hampshire. No crew member was aboard at the time of the loss.

6. Following the Rochester loss McGee informed Manchester that it would not renew Manchester's coverage for the next policy year. McGee also informed Manchester that it was placing an attendance requirement in Manchester's policy for the duration of the policy in effect at the time.

7. After receiving notice of McGee's intention not to renew the policy, Manchester attempted to procure insurance in the London insurance market. To this end, John Harrington, an account executive at Manchester's insurance agent, Kelly Associates, Inc., contacted Paul Parkinson, a London insurance

6

broker, and sent Parkinson a completed armored car insurance proposal form.

8. The proposal form includes a "yes" answer to the following question:

> When armoured vehicle is not in a secured and guarded concourse will at least one man stay in each vehicle during operations regardless of circumstance?

Defendants' Ex. M. Reference was also made in the answer to Manchester's procedural handbook, which was attached to the proposal form. The form is signed by Manchester's president, Deolinda Stewart.

9. As a precondition to coverage in the London market, American Security Services Corporation was commissioned to perform a survey of Manchester's operation. The survey was performed by Ronald Bray and Owens Turner.

10. Bray and Turner inspected Manchester's operation, including the morning loading procedures. Prior to the filing of a preliminary report, Bray discussed what he perceived to be shortcomings in Manchester's operation with Robert Stewart and Manchester's Vice President, Roland St. Hiliare. Bray informed Stewart and St. Hiliare that Manchester's practice of parking pre-loaded vehicles in the yard of the Harvey Road facility without crew members on board created an unacceptable risk, and

7

that no insurance company would be willing to pay for a loss resulting from such a practice.

11. The preliminary report, which Manchester later received, confirms that this conversation took place. The report states:

> [V]ehicles are pre-loaded daily in the early morning and left unattended outside of the terminal until crew members come in. The Assured did not consider this an unattended vehicle situation. The inspection team clarified this confusion.

Defendants' Ex. P at 3.

12. The "findings" section of the report includes the following observation:

> To make room for all of the trucks to be loaded, vehicles are moved to the outside of the building and left unattended until crew members arrive. A loss could occur due to an unattended vehicle. The Assured did not feel he was violating the unattended vehicle warranty by performing such loading functions.

Id. at 5.

13. The "requirements" section of report suggests the following corrective action:

> In the event of truck removal from the terminal, the vehicle should have no less than one armed guard on board at all times. Pre-loaded trucks must not be left unattended outside the terminal.

Id. at 7.

13. Manchester received a letter dated June 6, 1988, from John Harrington, in which Harrington indicated that Manchester

8

would be "required to comply with any changes deemed necessary by the American Security inspectors within the timeframes indicated in their report," Defendants' Ex. Q, and that coverage would be denied on the London market if the required changes were not made and a loss occurred.

14. By letter of June 20, 1988 to John Harrington, Stewart represented that Manchester would be in full compliance with the requirements set forth in the American Security survey before July 21, 1988. The letter was forwarded to Malcolm Blair in London, who agreed to provide coverage to Manchester for the upcoming policy year.

15. Despite its representation, Manchester never deviated from its practice of leaving pre-loaded trucks in the yard with no crew members on board. At some point the possibility of placing a guard on each vehicle was discussed, but the idea was dismissed as being economically not feasible.

16. Following the completion of the American Security survey, Manchester began using a "blocker truck" with an armed guard aboard to prevent vehicles from entering or exiting the yard during loading.

17. Although Robert Stewart testified that he believed the attendance requirement set forth in the American Security

preliminary report would not apply to vehicles parked in the yard of the Harvey Road facility, this testimony was not credible. Stewart's assertion is belied by the plain meaning of the requirement, when read in conjunction with the report's factual findings; the indication in the report that "the inspection team clarified [Manchester's] confusion," Defendants' Ex. P at 3; Manchester's implementation of remedial measures to improve security for pre-loaded vehicles in the yard after the completion of the report; and Stewart's admission that Manchester considered but dismissed, for economic reasons, the idea of placing a driver in every pre-loaded vehicle parked in its yard.

18. By letters of June 19, and June 21, 1989, Harrington informed Manchester that it had procured a new policy from underwriters in the London market for the upcoming policy year, and that the attendance requirement in the policy would remain in force for the upcoming policy year.

19. Paul Parkinson procured insurance for Manchester through the London market for policy years 1989 through 1993. London & Edinburgh served as lead underwriter for Manchester's coverage for the policy years beginning June 1991 and June 1993.

20. As a broker on the London market, Parkinson was under a duty to disclose the relevant facts concerning the risk associated with Manchester's application.

10

21. In reviewing Manchester's application, London & Edinburgh had access to Manchester's "placing file," which contained documents pertinent to Manchester's insurance coverage and was available to underwriters in the London market.

22. At the behest of the Ian McAllister, the underwriter at London & Edinburgh who agreed to provide coverage for Manchester's risk, Frances Mullen and James Wells were commissioned in 1991 to perform a routine survey of Manchester's operation.

23. Mullen and Wells performed their inspections on July 2, and July 18, 1991. In ascertaining whether Manchester had in fact complied with the requirements set forth in the American Security survey, Mullen was informed by Robert Stewart or by Ronald St. Hiliare, in the presence of Robert Stewart, that a driver was aboard any Manchester vehicle containing liabilities at all times, including during the morning loading period.

24. This conclusion is confirmed by the report that Mullen and Wells filed, which lists the shortcomings noted in the

American Security report and the remedial action undertaken, and includes the following passage:

| SHORTCOMING | ACTION |
|---|---|
| 12. The pre-loaded trucks are placed outside until crew members arrive and check out the trucks. Liabilities are left unattended in the trucks. | Guards are present at all times when liabilities are outside of the building. A driver is also in any truck containing liabilities. |

Defendants' Ex. W at 1.

25. The Mullen report was returned to London & Edinburgh and was reviewed on September 9, 1991, by McAllister's assistant.

26. At the time the cover note for the 1993 policy year was executed, McAllister, who commissioned the Mullen report, believed that Manchester had complied with each of the requirements originally set forth in the American Security preliminary report, and did not intend to provide coverage for losses suffered as a result of Manchester's failure to implement those requirements.

Rulings of Law

1. In an insurance dispute, the insurer bears the burden of proving noncoverage. See RSA 491:22-a (1983).

2. A provision in an insurance policy is ambiguous if reasonable disagreement concerning its meaning or application is

12

possible. <u>Smith v. Liberty Mutual Ins. Co.</u>, 130 N.H. 117, 122, 536 A.2d 164, 166 (1987).

3. Reasonable disagreement is possible concerning the applicability of the attendance requirement in the 1993 cover note to losses from pre-loaded vehicles parked in the yard of Manchester's Harvey Road facility. <u>See</u> <u>Manchester Security Serv., Inc. v. London & Edinburgh Ins. Co.</u>, No. 94-193-JD, slip op. at 1-2 (D.N.H. June 17, 1996); <u>Manchester Security Serv., Inc. v. London & Edinburgh Ins. Co.</u>, No. 94-193-JD, slip op. at 2 (D.N.H. Mar. 18, 1996)

4. Although ambiguities in insurance policies ordinarily are construed against the insurer, <u>Trombly v. Blue Cross/Blue Shield</u>, 120 N.H. 764, 772, 423 A.2d 980, 984-85 (1980), this presumption may be rebutted by evidence that the parties did not intend to provide coverage in a particular situation, <u>Smith v. Liberty Mutual Ins. Co.</u>, 130 N.H. 117, 123-24, 536 A.2d 164, 167-67 (1987); <u>Town of Epping v. St. Paul Fire & Marine Ins. Co.</u>, 122 N.H. 248, 252-53, 444 A.2d 496, 499 (1982).

Conclusions

After considering the law and the facts, the court makes the following findings:

13

1. Manchester Security, through its 2nd Vice President, Robert Stewart, understood that the insurance Paul Parkinson procured in the London market in general, and under the policy in effect at the time of the October 2, 1993 loss in particular, would not cover losses from pre-loaded vehicles parked in the yard of the Harvey Road facility with no employees on board.

2. London & Edinburgh, through its underwriter, Ian McAllister, intended not to provide coverage for losses from pre-loaded vehicles parked in the yard of the Harvey Road facility with no employees on board.

3. The policy's attendance requirement, as understood through extrinsic evidence of the parties' intent, precludes coverage for the loss at issue, regardless of whether a complicitous Manchester employee was on board the trucks at the specific instant when money was removed. Manchester's failure to assign an employee to each pre-loaded vehicle at all times created precisely the hazard against which the surveyors commissioned by London & Edinburgh and its predecessors had warned, and created a state of disorder -- where no Manchester employee was accountable for funds on a specific pre-loaded vehicle, and where movement into and out of vehicles parked in the yard was commonplace -- upon which those responsible for the theft were able to capitalize. Thus, even accepting the

14

plaintiff's contention that the attendance requirement in the policy applies solely to losses actually caused by Manchester's failure to place an employee on board its vehicles, Manchester's failure to comply with the attendance requirement at all times bars recovery for the loss at issue.

4. The cover note evidencing the plaintiff's insurance coverage does not cover the loss the plaintiff sustained on October 21, 1993. This finding disposes of all remaining issues in this case.

## Judgment

The clerk is ordered to enter final judgment in favor of the defendants and to close the case.

SO ORDERED.

_____
Joseph A. DiClerico, Jr.
Chief Judge

August 28, 1996

cc: Andrew D. Dunn, Esquire
    Michael Lenehan, Esquire
    Louis M. Rohrberg, Esquire

15